# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | |
|---|---|
| PERSONALWEB TECHNOLGIES, LLC §<br>§<br>  Plaintiff, §<br>§<br>vs. §<br>§<br>NEC CORPORATION OF AMERICA, INC. §<br>§<br>  Defendant. § | CASE NO. 6:11-CV-655<br>PATENT CASE |



**FILED**

MAR 2 5 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**CV 13 1317**

**EJD**

| | |
|---|---|
| PERSONALWEB TECHNOLGIES, LLC §<br>§<br>  Plaintiff, §<br>§<br>vs. §<br>§<br>GOOGLE INC. AND YOUTUBE, LLC §<br>§<br>  Defendants. § | CASE NO. 6:11-CV-656<br>PATENT CASE |

| | |
|---|---|
| PERSONALWEB TECHNOLGIES, LLC §<br>§<br>  Plaintiff, §<br>§<br>vs. §<br>§<br>NETAPP, INC. §<br>§<br>  Defendant. § | CASE NO. 6:11-CV-657<br>PATENT CASE |

1

| | | |
|---|---|---|
| PERSONALWEB TECHNOLGIES, LLC | § § § | |
| Plaintiff, | § § | |
| vs. | § § | CASE NO. 6:11-CV-658 PATENT CASE |
| AMAZON.COM, INC.; AMAZON WEB SERVICES LLC; AND DROPBOX, INC. | § § § | |
| Defendants. | § | |
| PERSONALWEB TECHNOLGIES, LLC | § § § | |
| Plaintiff, | § § | |
| vs. | § § | CASE NO. 6:11-CV-659 PATENT CASE |
| CARINGO, INC. | § § | |
| Defendant. | § | |
| PERSONALWEB TECHNOLGIES, LLC | § § § | |
| Plaintiff, | § § | |
| vs. | § § | CASE NO. 6:11-CV-660 PATENT CASE |
| EMC CORPORATION, AND VMWARE, INC. | § § § | |
| Defendants. | § | |
| PERSONALWEB TECHNOLGIES, LLC | § § § | |
| Plaintiff, | § § | |
| vs. | § § | CASE NO. 6:11-CV-683 PATENT CASE |
| AUTONOMY, INC. | § § | |
| Defendant. | § | |

| | |
|---|---|
| **PERSONALWEB TECHNOLGIES, LLC** | § § § |
| Plaintiff, | § § |
| vs. | § § **CASE NO. 6:12-CV-662** |
| **FACEBOOK, INC.** | § **PATENT CASE** § § |
| Defendant. | § § |

## MEMORANDUM OPINION AND ORDER

Before the Court are nine motions to transfer to the Northern District of California[1] and seven motions to stay pending resolution of a motion to transfer.[2] For the reasons set forth below, the Court resolves the transfer motions as follows: 6:11-CV-655 (Docket No. 59) is **DENIED**; 6:11-CV-656 (Docket No. 23) is **CONDITIONALLY GRANTED**; 6:11-CV-657 (Docket No. 27) is **CONDITIONALLY GRANTED**; 6:11-CV-658 (Docket No. 21) is **DENIED**; 6:11-CV-659 (Docket No. 21) is **DENIED**; 6:11-CV-660 (Docket No. 13) is **CONDITIONALLY GRANTED**; 6:11-CV-683 (Docket No. 63) is **DENIED**; 6:11-CV-683 (Docket No. 75) is **DENIED**; 6:12-CV-662 (Docket No. 25) is **CONDITIONALLY GRANTED**.

The motions to stay (6:11-CV-655 (Docket No. 72); 6:11-CV-656 (Docket No. 115); 6:11-CV-657 (Docket No. 91); 6:11-CV-658 (Docket No. 106); 6:11-CV-660 (Docket No. 95); 6:11-CV-683 (Docket No. 123); 6:12-CV-662 (Docket No. 26)) are **DENIED-AS-MOOT**.

---

[1] 6:11-CV-655 (Docket No. 59); 6:11-CV-656 (Docket No. 23); 6:11-CV-657 (Docket No. 27); 6:11-CV-658 (Docket No. 21); 6:11-CV-659 (Docket No. 21); 6:11-CV-660 (Docket No. 13); 6:11-CV-683 (Docket No. 63); 6:11-CV-683 (Docket No. 75); 6:12-CV-662 (Docket No. 25).
[2] 6:11-CV-655 (Docket No. 72); 6:11-CV-656 (Docket No. 115); 6:11-CV-657 (Docket No. 91); 6:11-CV-658 (Docket No. 106); 6:11-CV-660 (Docket No. 95); 6:11-CV-683 (Docket No. 123); 6:12-CV-662 (Docket No. 26).

The Court will retain jurisdiction over all Defendants through the claim construction

process. All conditional transfers will become effective the day the Court issues its claim

construction opinion.

## BACKGROUND

### a. PersonalWeb

The Plaintiff PersonalWeb Technologies, LLC ("PersonalWeb")[3] is a small company

based in Tyler. 6:11-CV-656, Docket No. 40, at 2. PersonalWeb is organized under Texas law in

Smith County, and it has been operating in Tyler since its formation in 2010. 6:11-CV-655,

Docket No. 61, at 2. PersonalWeb has six full-time employees and nine part-time employees, all

based in Tyler. *Id*. It is currently developing a product called StudyPods.[4] *Id*. PersonalWeb

performs beta testing of StudyPods with students at the University of Texas at Tyler ("UTT"). *Id*.

PersonalWeb also operates a Capstone program with UTT where UTT students design and create

elements of StudyPods. *Id*. Many of PersonalWeb's part-time employees are UTT students. *Id*.

PersonalWeb is a member of the Tyler Chamber of Commerce, and an East Texas architect

designed and constructed its office. *Id*. at 3.

### b. Defendants

NEC Corporation of America, Inc. ("NECAM") is headquartered in Irving, Texas. 6:11-

CV-655, Docket No. 61, Ex. 1. Google, Inc. ("Google") and YouTube LLC ("YouTube") are

headquartered in Mountain View and San Bruno, California, respectively. 6:11-CV-656, Docket

No. 23, at 4. NetApp, Inc. ("NetApp") is headquartered in Sunnyvale, California. 6:11-CV-657,

---

[3] In May 2010, Claria Innovations, LLC formed PersonalWeb, Inc. 6:11-CV-683, Docket No. 81, Ex. 44. PersonalWeb, Inc. was incorporated in Smith County, Texas. *Id*. A few months later, PersonalWeb, Inc. reorganized into the Plaintiff, PersonalWeb Technologies, LLC. *Id*. PersonalWeb Technologies, LLC is also incorporated in Smith County, Texas. *Id*.
[4] StudyPods is a "study-based search, chat and filing sharing platform." 6:11-CV-683, Docket No. 81, Ex. 45, at 3. The goal of StudyPods is to enable students to collaborate with their peers in an online community. 6:11-CV-683, Docket No. 81, Ex. 46, at 23.

Docket No. 27, at 1. Amazon.com, Inc. and Amazon Web Services LLC (collectively "Amazon") are headquartered in Seattle. 6:11-cv-658, Docket No. 21, at 6. Dropbox, Inc. ("Dropbox") is headquartered in San Francisco. *Id.* at 5. Caringo, Inc. ("Caringo") is headquartered in Austin, Texas. 6:11-CV-659, Docket No. 21, at 1. EMC Corporation ("EMC") is headquartered in Massachusetts. 6:11-CV-660, Docket No. 13, at 7. VMware, Inc. ("VMware") is headquartered in Palo Alto. *Id.* at 6. Hewlett-Packard Company ("HP") is headquartered in Palo Alto. 6:11-CV-683, Docket No. 75, at 12. HP Enterprise Services, LLC ("HPES") is headquartered in Plano, Texas. 6:11-CV-683, Docket No. 86, at 3. Autonomy, Inc. ("Autonomy") maintains dual headquarters in San Francisco and the United Kingdom. 6:11-CV-683, Docket No. 87, at 4 n.3. Facebook, Inc. ("Facebook") is headquartered in Menlo Park, California. 6:12-CV-662, Docket No. 25, at 4.

### c. The True Name Patents

The patents in this case (the "True Name" Patents) have a complex history, several aspects of which are relevant to the Motions to Transfer. The True Name Patents were all invented by David Farber and Ronald Lachman[5] and assigned to Kinetech, Inc. ("Kinetech"). 6:11-CV-655, Docket No. 59, at 5. In 2001, Kinetech began licensing the True Name portfolio to a company called Brilliant Digital Entertainment ("BDE") and its subsidiary Altnet, Inc. ("Altnet"). 6:11-CV-683, Docket No. 81, Ex. 35. In 2007, BDE acquired Kinetech and become the owner of the True Name Patents.[6] 6:11-CV-683, Docket No. 63, at 5. In September 2011, BDE assigned its interest in the True Name Patents to PersonalWeb. 6:11-CV-683, Docket No. 81, Ex. 45, at 4. As compensation for the Patents, BDE received a majority equity interest in

---

[5] Farber is a resident of Oaji, California, and Lachman is a resident of Northbrook, Illinois. 6:11-CV-683, Docket No. 63, at 5.

[6] BDE and its subsidiaries Kinetech and Altnet are all Delaware corporations headquartered in Studio City, California. 6:11-CV-683, Docket No. 63, at 5.

PersonalWeb, and BDE's CEO, Kevin Bermeister, became the Non-Executive Chairman of PersonalWeb's Board of Directors. *Id.*

## APPLICABLE LAW

Defendants argue they are entitled to transfer under 28 U.S.C. § 1404(a). Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The first inquiry when analyzing a case's eligibility for 1404(a) transfer is "whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed." *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) ("*In re Volkswagen I*").

Once that threshold inquiry is met, courts analyze both public and private factors relating to the convenience of parties and witnesses as well as the interests of particular venues in hearing the case. *See Humble Oil & Ref. Co. v. Bell Marine Serv., Inc.*, 321 F.2d 53, 56 (5th Cir. 1963); *In re Nintendo Co., Ltd.*, 589 F.3d 1194, 1198 (Fed. Cir. 2009); *In re TS Tech USA Corp.*, 551 F.3d 1315, 1319 (Fed. Cir. 2009). The private factors are: 1) the relative ease of access to sources of proof; 2) the availability of compulsory process to secure the attendance of witnesses; 3) the cost of attendance for willing witnesses; and 4) all other practical problems that make trial of a case easy, expeditious, and inexpensive. *In re Volkswagen I*, 371 F.3d at 203; *In re Nintendo*, 589 F.3d at 1198; *In re TS Tech*, 551 F.3d at 1319. The public factors are: 1) the administrative difficulties flowing from court congestion; 2) the local interest in having localized interests decided at home; 3) the familiarity of the forum with the law that will govern the case; and 4) the avoidance of unnecessary problems of conflict of laws or in the application of foreign law. *In re*

*Volkswagen I*, 371 F.3d at 203; *In re Nintendo*, 589 F.3d at 1198; *In re TS Tech*, 551 F.3d at 1319.

The plaintiff's choice of venue is not a factor in this analysis.[7] *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 314–15 (5th Cir. 2008) ("*In re Volkswagen II*"). Rather, the plaintiff's choice of venue contributes to the defendant's burden in proving that the transferee venue is "clearly more convenient" than the transferor venue. *In re Volkswagen II*, 545 F.3d at 315; *In re Nintendo*, 589 F.3d at 1200; *In re TS Tech*, 551 F.3d at 1319. Furthermore, though the private and public factors apply to most transfer cases, "they are not necessarily exhaustive or exclusive," and no single factor is dispositive. *In re Volkswagen II*, 545 F.3d at 314–15.

### a. The Relative Ease of Access to Sources of Proof

Despite technological advances that certainly lighten the relative inconvenience of transporting large amounts of documents across the country, this factor is still a part of the transfer analysis. *In re Volkswagen II*, 545 F.3d at 316. Courts analyze this factor in light of the distance that documents, or other evidence, must be transported from their existing location to

---

[7] Only the Fifth Circuit gives no deference to a plaintiff's choice of forum. All other circuits give some deference to a plaintiff's choice of forum, although the degree of deference varies among the circuits. In several circuits, the plaintiff's choice of forum is a specific factor in the transfer analysis. *See D.H. Blair & Co., Gottdiener*, 462 F.3d 95, 107 (2d Cir. 2006); *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3rd Cir. 1995); *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000); *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1167 (10th Cir. 2010); *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1167 (10th Cir. 2010); *In re Scott*, 709 F.2d 717, 720 (D.C. Cir. 1983). In the remaining circuits, the plaintiff's choice of forum is entitled to substantial deference. *See Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 13 (1st Cir. 2009) ("There is a strong presumption in favor of the plaintiff's choice of forum.") (internal quotations omitted); *Collins v. Straight, Inc.*, 748 F.2d 916, 921 (4th Cir. 1984) ("The plaintiff's choice of forum should rarely be disturbed."); *Reese v. CNH Am. LLC*, 574 F.3d 315, 320 (6th Cir. 2009) ("Unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."); *In re Nat'l Presto Indus., Inc.*, 347 F.3d 662, 663–64 (7th Cir. 2003) (Posner, J.) ("The plaintiff's choice of forum should rarely be disturbed."); *In re Apple, Inc.*, 602 F.3d 909, 913 (8th Cir. 2010) ("Federal courts give considerable deference to a plaintiff's choice of forum."); *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 260 (11th Cir. 1996) ("The plaintiff's choice of forum should not be disturbed unless it is clearly outweighed by other considerations."). Only the Fifth Circuit gives no deference to a plaintiff's choice of forum. Since the Federal Circuit applies regional circuit law to transfer motions, *see In re Link_A_Media Devices Corp.*, 662 F.3d 1221, 1222–23 (Fed. Cir. 2011), a plaintiff filing a patent case in Texas, Louisiana, or Mississippi is much more likely to be transferred than a plaintiff filing in the other 47 states. *See, e.g., In re Affymetrix, Inc.*, 2010 WL 1525010, at *3 n.3 (Fed. Cir. Apr. 13, 2010) (noting Fifth Circuit law is more favorable to transfer than Seventh Circuit law).

the trial venue. *See id.* This factor will turn upon which party, usually the accused infringer, will most probably have the greater volume of documents relevant to the litigation and their presumed location in relation to the transferee and transferor venues. *See, e.g., In re Volkswagen II*, 545 F.3d at 314–15; *In re Nintendo*, 589 F.3d at 1199; *In re Genentech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir. 2009). However, documents that have been moved to a particular venue in anticipation of a venue dispute should not be considered. *In re Hoffman-La Roche Inc.*, 587 F.3d 1333, 1336–37 (Fed. Cir. 2009).

### b. The Availability of Compulsory Process to Secure the Attendance of Witnesses

This factor will weigh more heavily in favor of transfer when more third-party witnesses reside within the transferee venue. *See In re Volkswagen II*, 545 F.3d at 316. The factor will weigh the heaviest in favor of transfer when a transferee venue is said to have "absolute subpoena power." *Id.* "Absolute subpoena power" is subpoena power for both depositions and trial. *In re Hoffmann-La Roche Inc.*, 587 F.3d at 1338.

### c. The Cost of Attendance for Willing Witnesses

This factor is analyzed giving broad "consideration [to] the parties and witnesses in all claims and controversies properly joined in a proceeding." *In re Volkswagen I*, 371 F.3d at 204. All potential material and relevant witnesses must be taken into account for the transfer analysis, irrespective of their centrality to the issues raised in a case or their likelihood of being called to testify at trial. *See In re Genentech*, 566 F.3d at 1343 ("Requiring a defendant to show that a potential witness has more than relevant and material information at this point in the litigation or risk facing denial of transfer on that basis is unnecessary.").

The Fifth Circuit has adopted a "100 mile rule" to assist with analysis of this factor. *See In re Volkswagen I*, 371 F.3d at 204–05. "When the distance between an existing venue for trial

of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." *Id.* at 205. When applying the "100 mile rule" the threshold question is whether the transferor and transferee venues are more than 100 miles apart. *See In re Volkswagen II*, 545 F.3d at 317; *In re TS Tech*, 551 F.3d at 1320. If so, then a court determines the respective distances between the residences (or workplaces) of all the identified material and relevant witnesses and the transferor and transferee venues. *See In re Volkswagen II*, 545 F.3d at 317; *In re TS Tech*, 551 F.3d at 1320. The "100 mile rule" favors transfer (with differing degrees) if the transferee venue is a shorter average distance from witnesses than the transferor venue. *See In re Volkswagen II*, 545 F.3d at 317; *In re TS Tech*, 551 F.3d at 1320. Furthermore, the existence or non-existence of direct flights can impact the analysis of travel time. *See In re Volkswagen I*, 371 F.3d at 204, n.3. Thus, regardless of the "straight line" distances calculated for the "100 mile rule," if "travel time" distances favor the transferee venue, then this factor will favor transfer. However, the "100 mile rule" should not be rigidly applied. *See In re Genentech*, 566 F.3d at 1344. When a particular witness will be required to travel "a significant distance no matter where they testify," then that witness is discounted for purposes of the "100 mile rule" analysis. *Id.* (discounting European witnesses and documents transported from Washington D.C. in the convenience analysis when reviewing a denial of transfer from Texas to California).

In cases where no potential witnesses are residents of the court's state, favoring the court's location as central to all of the witnesses is improper. *Id.* at 1344. Finally, this factor favors transfer when a "substantial number of material witnesses reside in the transferee venue" and no witnesses reside in transferor venue regardless of whether the transferor venue would be more convenient for all of the witnesses. *Id.* at 1344–45.

### d.  Other Practical Problems

Practical problems include those that are rationally based on judicial economy. Particularly, the existence of duplicative suits involving the same or similar issues may create practical difficulties that will weigh heavily in favor or against transfer. *In re Volkswagen of Am., Inc.*, 566 F.3d 1349, 1351 (Fed. Cir. 2009) ("*In re Volkswagen III*").

### e.  The Administrative Difficulties Flowing from Court Congestion

The speed with which a case can come to trial and be resolved is a factor in the transfer analysis. *In re Genentech*, 566 F.3d at 1347. This factor appears to be the most speculative, and this factor alone should not outweigh other factors. *Id.*

### f.  The Local Interest in Having Localized Interests Decided at Home

The Fifth Circuit has explained that "[j]ury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation." *In re Volkswagen I*, 371 F.3d at 206. This factor analyzes the "factual connection" that a case has with both the transferee and transferor venues. *See id.* Generally, local interests that "could apply virtually to any judicial district or division in the United States" are disregarded in favor of particularized local interests. *In re Volkswagen II*, 545 F.3d at 318 (in a products liability suit, disregarding local interest of citizens who used the widely-sold product within the transferor venue); *In re TS Tech*, 551 F.3d at 1321. Thus, when products are sold throughout the United States, citizens of a venue do not have a particularized interest in deciding the dispute simply based on product sales within the venue. *In re Nintendo*, 589 F.3d at 1198.

## ANALYSIS

### a. Common Issues

This order addresses nine separate transfer motions, and all moving Defendants will be evaluated individually. *See Norman IP Holdings, LLC v. Lexmark Int'l, Inc.*, 2012 WL 3307942, at *4 (E.D. Tex. Aug. 10, 2012) (Davis, J.). However, there are many issues common to all Defendants that can be evaluated jointly. This section addresses those issues common to all Defendants.

#### i. PersonalWeb's Tyler Contacts

A consistent argument throughout all Defendants' briefing is that the Court should not consider PersonalWeb's Tyler contacts in its transfer analysis. Defendants contend BDE established and is now masquerading as PersonalWeb to establish venue in the Eastern District of Texas. *See, e.g.,* 6:11-CV-656, Docket No. 23, at 3 (referring to PersonalWeb as an "elaborate construction of a shell company in Texas"). Defendants argue that because PersonalWeb has no legitimate ties to East Texas, its Tyler connections should be given no weight. For the following reasons, the Court rejects this contention and will consider PersonalWeb's Tyler contacts in the transfer analysis.[8]

Defendants make two arguments that PersonalWeb's Tyler contacts should be disregarded as "recent and ephemeral." First, there is a close relationship between PersonalWeb and BDE. For example, BDE maintains a controlling financial interest in PersonalWeb—BDE assigned the True Name Patents to PersonalWeb in exchange for a controlling equity interest in PersonalWeb. *See* 6:11-CV-683, Docket No. 63, at 5. There is also overlap between the boards

---

[8] The Court does not give weight to PersonalWeb's choice of venue. *See In re Volkswagen II*, 545 F.3d at 315. However, the Court does consider PersonalWeb's location in determining whether transfer would be more convenient for it, just as the Court considers every other party's location for the same purpose. *See id.*

## ANALYSIS

### a. Common Issues

This order addresses nine separate transfer motions, and all moving Defendants will be evaluated individually. *See Norman IP Holdings, LLC v. Lexmark Int'l, Inc.*, 2012 WL 3307942, at *4 (E.D. Tex. Aug. 10, 2012) (Davis, J.). However, there are many issues common to all Defendants that can be evaluated jointly. This section addresses those issues common to all Defendants.

### i. PersonalWeb's Tyler Contacts

A consistent argument throughout all Defendants' briefing is that the Court should not consider PersonalWeb's Tyler contacts in its transfer analysis. Defendants contend BDE established and is now masquerading as PersonalWeb to establish venue in the Eastern District of Texas. *See, e.g.*, 6:11-CV-656, Docket No. 23, at 3 (referring to PersonalWeb as an "elaborate construction of a shell company in Texas"). Defendants argue that because PersonalWeb has no legitimate ties to East Texas, its Tyler connections should be given no weight. For the following reasons, the Court rejects this contention and will consider PersonalWeb's Tyler contacts in the transfer analysis.[8]

Defendants make two arguments that PersonalWeb's Tyler contacts should be disregarded as "recent and ephemeral." First, there is a close relationship between PersonalWeb and BDE. For example, BDE maintains a controlling financial interest in PersonalWeb—BDE assigned the True Name Patents to PersonalWeb in exchange for a controlling equity interest in PersonalWeb. *See* 6:11-CV-683, Docket No. 63, at 5. There is also overlap between the boards

---

[8] The Court does not give weight to PersonalWeb's choice of venue. *See In re Volkswagen II*, 545 F.3d at 315. However, the Court does consider PersonalWeb's location in determining whether transfer would be more convenient for it, just as the Court considers every other party's location for the same purpose. *See id.*

of the two companies. Kevin Bermeister, BDE's CEO and Director, serves as the Non-Executive Chairman of PersonalWeb. 6:11-CV-658, Docket No. 21, at 1; 6:11-CV-683, Docket No. 75, at 4. Lastly, BDE extended credit to PersonalWeb on multiple occasions to cover operating expenses. 6:11-CV-683, Docket No. 81, Ex. 34. Despite the close relationship between the two companies, Bermeister asserts that BDE had no role in PersonalWeb's formation. *See* 6:11-CV-683, Docket No. 81, Ex. 35.

Second, PersonalWeb's top two employees own homes in Southern California. Both Michael Weiss and Wasef Kassis, PersonalWeb's CEO and CTO, respectively, have homes in California, and both regularly travel to California to visit family. 6:11-CV-656, Docket No. 23, at 6. However, both men assert they spend at least 75% of their time in Tyler. Weiss represents that he only owns a home in California because market conditions have prevented him from selling his house. 6:11-CV-683, Docket No. 81, Ex. 45, at 3. Weiss stated that his house is on the market, and the remainder of his family will move to Tyler when the house sells. Kassis represents that he owns a home in California as an investment property. 6:11-CV-655, Docket No. 40, Ex. 34, at 2.

Defendants also assert that a former part-time employee of PersonalWeb's testimony supports their argument. *See* 6:11-CV-656, Docket Nos. 107 & 108. However, considering the employee's testimony as a whole, the Court finds it so vague, multifaceted, and bizarre that the Court gives little, if any, weight to the testimony.[9]

---

[9] In May 2012, Jacob Drew approached Google's counsel stating that he was worried PersonalWeb's document retention policy might put him at risk of liability. Docket No. 108, Ex. 2, at 12. After hiring independent counsel for Mr. Drew, Google deposed him in September 2012. *See id.* Drew testified that the company wanted to incorporate the True Name Patents into its StudyPods because it would improve the company's litigation position. *Id.* at 10. He also testified he "was told it was very important for PersonalWeb to be located in Tyler, Texas." *Id.* Drew further stated he had a "volatile" relationship with Michael Weiss, PersonalWeb's CEO, and that Weiss "yelled and screamed at him" on numerous occasions, making him feel physically unsafe. *Id.* at 12. Drew also believed Weiss "borderline assault[ed]" his wife. *Id.* Drew described Weiss as "unpredictable" and that "[he did not] know what this

Courts must ensure the purposes of venue laws are not frustrated by a party's attempt at manipulation. *See Hertz Corp. v. Friend*, 130 S.Ct. 1181, 1195 (2010). Accordingly, a plaintiff's contacts with its chosen forum must be disregarded if they are "recent, ephemeral, and an artifact of litigation." *In re Zimmer Holdings, Inc.*, 609 F.3d 1378, 1381 (Fed. Cir. 2010).

All of the contacts found by the Federal Circuit to be "recent and ephemeral" are of substantially less magnitude and longevity than PersonalWeb's contacts with Tyler. In *In re Hoffman-La Roche Inc.*, 587 F.3d 1333 (Fed. Cir. 2009), a California-based plaintiff transferred 75,000 pages of documents to its litigation counsel's office in Texas prior to litigation. *Id.* at 1337–38. If not for the litigation, there would have been no reason for the documents to be in Texas. *Id.* at 1338. Because the documents had no legitimate connection to Texas, their "Texas" ties were disregarded. *See id.* ("The assertion that these documents are "Texas" documents is a fiction which appears to be [sic] have been created to manipulate the propriety of venue.").

In *In re Zimmer Holdings, Inc.*, 609 F.3d 1378 (Fed. Cir. 2010), the plaintiff transferred all its documents to Texas prior to litigation. *Id.* at 1381. It also established its "principal place of business" in Texas, but its Texas "headquarters" were merely offices shared by another of its trial counsel's clients, and none of its employees actually worked at the Texas "headquarters."

---

guy is going to do when he stands up." Docket No. 110, Ex. 4, at 8. Among the more interesting portions of the deposition, Drew testified Weiss forced him to go "ghost hunting" with him where Drew was "chased by people [he] didn't even know holding weapons in the woods." *See id.* Despite his apparent fear for his own safety, Drew did not resign over Weiss's behavior. Docket No. 108, Ex. 2, at 12. Drew contends he ultimately resigned over concerns about PersonalWeb's document retention policy. *Id.* at 13. However, at the time of his resignation, Drew was also unhappy with his compensation. *Id.* Despite a recent raise, Drew believed he was entitled to equity in a product he was developing. *Id.* PersonalWeb is not the first company Drew left on less than cordial terms. Drew previously worked as a developer for a bank, but he was terminated when he refused to sign a proprietary rights agreement. Docket No. 117, Ex. 4, at 3. After his termination, Drew sought out various members of the media regarding policies enacted by the company he believed were unjust. *Id.* at 6. He also established a blog criticizing his former employer's corporate decisions. *Id.* at 5. Drew's quotes appeared in USA Today, and he even made an on-camera appearance on Nightline. *Id.* at 5–6. Drew also alleges he was contacted by a staff member of a United States senator to talk about new banking regulations and their impact on his former employer. *Id.* at 8. Despite his apparent outrage at his former company's policies, he never once challenged those polices during his employment. *Id.* at 7.

13

*Id.*; *see also In re Apple, Inc.*, 2010 WL 1922942, at *1 (Fed. Cir. May 12, 2010) (giving no weight to a plaintiff's Texas office when it shared the office with its litigation counsel).

In *In re Microsoft Corp.*, 630 F.3d 1361 (Fed. Cir. 2011), the United Kingdom-based plaintiff relocated its corporate headquarters to Tyler, moved all its documents to its new headquarters, and even incorporated in Texas. *Id.* at 1362. However, the plaintiff had no employees anywhere in the United States—its managing member resided in the United Kingdom—and it incorporated in Texas a mere sixteen days before filing suit. *Id.*

Unlike any of these cases, PersonalWeb is a legitimate company operating a legitimate business in East Texas. PersonalWeb's extensive Tyler contacts stand in stark contrast to the "recent and ephemeral" contacts of *Hoffman-La Roche*, *Zimmer Holdings*, and *Microsoft*. Unlike those cases, PersonalWeb genuinely established its corporate headquarters in Tyler over a year before any suit was filed. It was founded and incorporated in Tyler. 6:11-CV-655, Docket No. 61, Ex. 39. Its sole office is in Tyler. *Id.* It has fifteen employees, and all of them work in Tyler, including its Chief Executive Officer and Chief Technical Officer.[10] *Id.* The company leases office space in downtown Tyler, houses all its servers in Tyler, and maintains all company documents in Tyler. *Id.* The company is a member of the Tyler Chamber of Commerce, and its CEO is a member of the Greater East Texas IT Professionals. *Id.* Further, the company hires students from the University of Texas at Tyler to work part-time, and it established work-study programs with UTT. *Id.* It also conducts beta testing of its Study Pods on the UTT campus. *Id.* These are all activities of a company legitimately headquartered and doing business in Tyler, Texas.

---

[10] Defendants argue these contacts are minimized because Michael Weiss and Wasef Kassis both own homes in the Los Angeles area. However, both men declared they spend over 75% of their work time in Tyler. *See* 6:11-CV-655, Docket No. 61, Ex. 40, at 3; Ex. 34, at 2. The Court will not minimize PersonalWeb's East Texas contacts based on the personal decisions of two employees regarding the location of their families.

PersonalWeb's contacts to Tyler are much more significant than those this Court found sufficient in *Eolas Technologies, Inc. v. Adobe Systems, Inc.*, 2010 WL 3835762 (E.D. Tex. Sep. 28, 2010) (Davis, J.), *mandamus denied*, *In re Google Inc.*, 2011 WL 772875 (Fed. Cir. Mar. 4, 2011). Accordingly, the Court will not disregard PersonalWeb's Tyler contacts as a mere "artifact of litigation."

### b. Common Transfer Factors

The following transfer factors are identical for each Defendant and can be evaluated jointly: availability of compulsory process to secure the attendance of unwilling witnesses; all other practical problems that make trial of a case easy, expeditious, and inexpensive; administrative difficulties flowing from court congestion; familiarity of the forum with the law that will govern the case; and avoidance of unnecessary problems of conflicts of laws or the application of foreign laws.

### i. The Availability of Compulsory Process to Secure the Attendance of Witnesses

The parties identified several groups of potentially relevant third-party witnesses. The first group contains the two inventors of the True Name Patents—David Farber and Ronald Lachman—who live in Ojai, California, and Northbrook, Illinois, respectively. 6:11-CV-655, Docket No. 59, at 5; Docket No. 61, Ex. 35. The prosecuting attorney of the True Name Patents, Brian Siritzky, lives in Potomac, Maryland. 6:11-CV-655, Docket No. 61, Ex. 38. The next group of third-party witnesses contains employees of BDE, PersonalWeb's corporate parent. Kevin Bermeister, the CEO and Director of BDE,[11] lives in Sydney, Australia, and Anthony

---

[11] Bermeister is also the CEO and CFO of Altnet and Kinetech. 6:11-CV-683, Docket No. 75, at 4.

Neumann, BDE's Vice President of Business Development,[12] lives in Southern California. 6:12-CV-662, Docket No. 32, at 4.

The third group of non-party witnesses are licensees of the True Name Patents. Defendants identified two licensees of the Patents headquartered in the Bay Area. *See* 6:11-CV-683, Docket No. 63, at 11. The last group of identified third-party witnesses are the so-called "relevant prior art witnesses." The Defendants identified various inventors of prior art residing in Northern California, including Dr. Martin Hellman, a Stanford professor whose patent was used to reject claims of one of the True Name Patents during re-examination. *Id.* PersonalWeb countered Defendants' California witnesses by identifying 38 inventors cited in the True Name Patents residing in Texas. 6:11-CV-657, Docket No. 40, at 16.

The location of prior art witnesses does not favor either venue in this case. Both sides identified a significant number of inventors of prior art within the subpoena power of their desired forums. Based on the number of prior art inventors in each venue, neither venue appears to be more convenient than the other for the prior art witnesses.[13]

The five most relevant third-party witnesses are the two BDE employees, the two inventors, and the prosecuting attorney. *See In re Genentech*, 566 F.3d at 1343 (instructing courts to assess "the relevance and materiality of the information the witness may provide"). None of these witnesses are subject to this Court's subpoena power, but two (Anthony Neumann and David Farber) would be subject to the subpoena power of the Northern District of California.[14]

---

[12] Neumann is also the Corporate Secretary of Altnet and Kinetech. 6:11-CV-683, Docket No. 75, at 4.

[13] In the Court's experience, inventors of prior art rarely, if ever, actually testify at trial. In most cases, the only witnesses who actually testify about prior art are the named inventors of the patents-in-suit and expert witnesses. Occasionally, a party's corporate representative will also testify about prior art. Prior art inventors almost never testify.

[14] PersonalWeb provided declarations from all five men stating they would be willing to voluntarily testify at trial in the Eastern District of Texas. Such declarations are non-binding. If any man changed his mind and refused to travel

*See Brackett v. Hilton Hotels Corp.*, 619 F. Supp. 2d 810, 821 (N.D. Cal. 2008) ("The California district courts have the power to subpoena witnesses throughout the state."). Additionally, the Northern District of California will have subpoena power over Bay Area-based licensees Skype and Audible Magic. Accordingly, this factor favors transfer for all Defendants. *See In re Genentech*, 566 F.3d at 1345. While all may provide relevant testimony, compulsory process over two third-party witnesses and two licensees does not overwhelm the transfer analysis.

### ii. All other practical problems that make trial of a case easy, expeditious, and inexpensive

There are currently fourteen PersonalWeb cases before this Court—seven filed in 2011 and seven filed in 2012.[15] All fourteen cases involve the same True Name Patents. Eleven of the cases have been assigned dates for their claim construction hearings and trials, and all eleven have been given identical dates. The remaining three cases are in their infancy stages and have not been assigned claim construction and trial dates.

Judicial economy weighs against transfer.[16] This Court already has one claim construction hearing scheduled for eleven of the PersonalWeb cases, and a second claim construction hearing will be scheduled for the remaining three cases. Judicial economy is not

---

to Texas, this Court could not compel his attendance at trial. Thus, the Court will not factor their willingness to travel to Texas into its transfer analysis.

[15] A fifteenth PersonalWeb case settled. *See* 6:12-CV-657.

[16] BDE asserted several of the True Name Patents in three separate actions in the Central District of California between 2004 and 2007. *See* 6:11-CV-657, Docket No. 27, at 5. In one of those cases, BDE successfully opposed a motion to transfer the case to New York, arguing the Central District of California was more convenient for BDE's documents and employee witnesses. *Id.* During briefing on the motion, Kevin Bermeister submitted a declaration on behalf of BDE stating that litigating the case outside of California would impose a "substantial hardship and burden" on BDE. *Id.* Several Defendants now argue PersonalWeb is estopped from arguing California is not the most convenient forum for this litigation because of Bermeister's declaration in the previous litigation. *See, e.g.,* 6:11-CV-658, Docket No. 21, at 14. This argument is flawed because PersonalWeb was not a party to the prior litigations. *See In re Ark-La-Tex Timber Co.*, 482 F.3d 319, 332 (5th Cir. 2007) (using the word "party" repeatedly when describing the elements of judicial estoppel). In fact, PersonalWeb did not even exist at the time of the California suits. Bermeister made those statements on behalf of BDE, a California company based in Los Angeles. PersonalWeb is a Texas company based in Tyler.

promoted by transferring one or more Defendants to California, thereby creating parallel proceedings in multiple courts. *See In re Vistaprint Ltd.*, 628 F.3d 1342, 1345 (Fed. Cir. 2010) (denying a petition for mandamus when "the district court correctly held a denial of transfer would produce gains in judicial economy"). Accordingly, this factor weighs against transfer.

### iii.   Administrative difficulties flowing from court congestion

This factor is neutral. Both sides presented evidence their desired forums would result in the quickest resolution of these cases. Defendants argue the median time to trial in the Northern District of California is 25.4 months, while the median time to trial in the Eastern District of Texas is 27.1 months. 6:11-CV-655, Docket No. 59, at 15. PersonalWeb cites a different statistic, noting the median time to jury trial is approximately ten months shorter in the Eastern District of Texas than in the Northern District of California. 6:11-CV-655, Docket No. 61, at 15. Because of the speculative nature of these statistics, this factor is neutral. *See In re Genentech*, 566 F.3d at 1347.

### iv.   Familiarity with the law / avoidance of unnecessary conflicts of law

Patent suits are governed by federal law, and both venues are equally capable of applying federal law to PersonalWeb's infringement claims. *See In re TS Tech*, 551 F.3d at 1320. Accordingly, these factors are neutral.

### c.  Individual Transfer Factors

The following transfer factors are unique to each Defendant, so they are evaluated individually: relative ease of access to sources of proof; cost of attendance for willing witnesses; and local interest in having localized interests decided at home.

### i. NECAM

#### 1. Relative ease of access to sources of proof

NECAM argues this factor favors transfer because the business unit responsible for the accused product is located in Santa Clara, meaning a large majority of its relevant documents are likely located in the Northern District of California. 6:11-CV-655, Docket No. 59, at 4. Additionally, NECAM contends all BDE, Altnet, and Kinetech documents relating to the True Name Patents are located in California. *Id.* at 6. For these reasons, NECAM asserts that many relevant documents in this case are located in California. *See* 6:11-CV-655, Docket No. 63, at 3 (calling its documents "closely connected" to Santa Clara).

PersonalWeb argues this factor weighs against transfer. 6:11-CV-655, Docket No. 61, at 12. NECAM's research and development of the accused products took place in Princeton, New Jersey, so many documents relating to the accused products are likely to be found there. *Id.* PersonalWeb further argues all its relevant documents are located in Tyler, and it would be inconvenient to transport them to Northern California. *Id.*

This factor weighs against transfer. While NECAM may have relevant documents in Santa Clara, it does not dispute that its accused products were developed in New Jersey. *See* 6:11-CV-655, Docket No. 63, at 2–3. Nor does it assert that it transferred all its R&D-related documents from New Jersey to its business group in Northern California. *See id.* Therefore, NECAM's relevant documents are likely to be located in both California and New Jersey. NECAM also conducts product testing in Washington, meaning there are likely documents relating to testing in the Seattle area. *See* 6:11-CV-655, Docket No. 59, at 4 (noting that "remaining functions" occur in New Jersey and Washington). In contrast, all of PersonalWeb's documents are located in Tyler. It would be inconvenient for PersonalWeb to transport its

documents to California, especially considering NECAM's documents are scattered among multiple locations. For these reasons, this factor weighs against transfer.

### 2. Cost of attendance for willing witnesses

The parties' arguments regarding this factor are very similar to their arguments regarding the location of proof. NECAM argues this factor weighs against transfer because the majority of its employee witnesses are located in California. 6:11-CV-655, Docket No. 59, at 11. PersonalWeb counters that this factor weighs against transfer because all its employee witnesses live in Tyler, and the NECAM engineers responsible for product development are likely located in New Jersey. 6:11-CV-655, Docket No. 61, at 10.

Similar to the location of proof, this factor weighs against transfer. All of PersonalWeb's employee witnesses are located in Tyler, and while many of NECAM's witnesses are located in California, there are likely relevant employee witnesses in New Jersey and Washington as well. For these reasons, this factor weighs against transfer.

### 3. Local interest in having localized interests decided at home

NECAM argues this factor weighs against transfer because the accused product is headquartered in Santa Clara. 6:11-CV-655, Docket No. 59, at 4. NECAM asserts that Santa Clara-based employees are responsible for marketing, sales, business operations, product management, and systems engineering for the accused product. *Id.* NECAM contends that while its corporate headquarters are located in Irving, Texas, no relevant product operations take place in Texas. *Id.* Instead, all relevant operations take place in Santa Clara, Princeton, or Bellevue, Washington. *Id.*

This factor weighs against transfer. NECAM attempts to minimize the relevance of its Texas operations, but its Texas operations are its *corporate headquarters*. *See* 6:11-CV-655,

Docket No. 61, Ex. 1. The Eastern District of Texas has a strong local interest in this case because both the Plaintiff and Defendant are headquartered in the state. While the Northern District of California has some local interest because product group responsible for the accused product is based there, this interest does not outweigh the fact that both parties are headquartered in Texas. This factor weighs against transfer.

### ii.  Google and YouTube[17]

#### 1.  Relative ease of access to sources of proof

The Google Defendants argue this factor favors transfer. 6:11-CV-656, Docket No. 23, at 5. Both Google Defendants are headquartered in Northern California, and both assert that their accused products were developed at their respective headquarters. *Id.* Because the accused products were developed in Northern California, all of the relevant documents associated with their products are located there. *Id.* at 13. Further, the Google Defendants contend they have no relevant documents in the Eastern District of Texas. *Id.*

PersonalWeb argues the Google Defendants' evidence is scattered among several states. 6:11-CV-656, Docket No. 40, at 4. For example, Google maintains offices in Dallas and Austin, and it has a substantial presence in New York. *Id.* at 10. PersonalWeb further asserts that four of Google's five "data centers" are located closer to the Eastern District of Texas than the Northern District of California. *Id.* at 4. PersonalWeb contends these data centers are relevant "because this case concerns the manner in which Google manages its data at its data centers and serves the data from its data centers."[18] *Id.* Lastly, PersonalWeb asserts that all its relevant documents are located in Tyler, and it would be inconvenient to transport them to California. *Id.* at 2.

---

[17] YouTube is a wholly-owned subsidiary of Google. 6:11-CV-656, Docket No. 23, at 4.
[18] The Google Defendants contend the data centers are "mere storage portals." 6:11-CV-656, Docket No. 45, at 5.

This factor favors transfer. Google and YouTube are both headquartered in the Northern District of California, and both developed their accused products there.[19] Thus, all their relevant documents are likely to be concentrated in Northern California. While PersonalWeb's documents are located in Tyler, the Google Defendants are likely to have a larger volume of relevant documents. *See In re Genentech*, 566 F.3d at 1345 (noting the accused infringer generally has a greater volume of relevant documents). Accordingly, this factor favors transfer.

## 2. Cost of attendance for willing witnesses

The Google Defendants argue this factor favors transfer because their most relevant employee witnesses are located in Northern California. 6:11-CV-656, Docket No. 23, at 4. Google asserts that its most relevant witnesses are located in Mountain View, while YouTube asserts that its most relevant witnesses are located in either San Bruno or Mountain View. *Id.* Additionally, the Google Defendants have no identifiable Texas employees with relevant information. *Id.* at 12.

PersonalWeb contends this factor does not favor transfer. PersonalWeb argues Google has relevant employee witnesses in several Texas cities, including Austin and Dallas.[20] 6:11-CV-656, Docket No. 40, at 4. PersonalWeb further argues all its employees reside in Tyler, so the presence of any Google witnesses in Northern California is negated by the presence of its own witnesses in Tyler. *See id.* at 11 (citing *Invitrogen v. Gen. Elec. Co.*, 2009 WL 331889, at *3 (E.D. Tex. Feb. 9, 2009)).

---

[19] The outcome of this factor is different for the Google Defendants than for NECAM because the Google Defendants both developed and manage the accused products at their corporate headquarters. In contrast, NECAM is headquartered in Dallas, developed its accused products in New Jersey, and manages its accused products in California. While NECAM's documents are scattered, the Google Defendants' documents are concentrated in Northern California.

[20] The Google Defendants contend these witnesses "have no relation to the accused systems." 6:11-CV-656, Docket No. 45, at 2.

The parties' respective conveniences are inversely related. Each side logically asserts that it would be most convenient for its employees to testify in their home forums. Regardless of where this case is tried, one side's employee witnesses must travel to a forum that is not their home. Any increase in convenience for one side's witnesses will result in a decrease in convenience for the other side's witnesses. For this reason, this factor is neutral.

### 3. Local interest in having localized interests decided at home

Both Google Defendants have several significant contacts with the Northern District of California. First, both companies are headquartered in the Bay Area; Google is headquartered in Mountain View, and YouTube is headquartered in San Bruno. 6:11-CV-656, Docket No. 23, at 3–4. Second, both developed the accused products at their home offices in Northern California. *Id.* at 4. Third, all the relevant personnel associated with the accused products work in Northern California. *Id.* at 5. In contrast, neither Google nor YouTube have any significant contacts with the Eastern District of Texas. Google has an office in Frisco, Texas, but that office does not appear to be related to the accused products. YouTube has no offices or facilities in the Eastern District of Texas. *Id.* at 4.

PersonalWeb contends this factor weighs against transfer because it is headquartered in the Eastern District of Texas. However, PersonalWeb's contacts with this forum are outweighed by the Google Defendants' contacts with the Northern District of California. Both Google Defendants are headquartered in the Bay Area, and everything related to the accused products is located there. For these reasons, this factor favors transfer.

### iii. NetApp

#### 1. Relative ease of access to sources of proof

NetApp argues this factor favors transfer. NetApp is headquartered in the Northern District of California—in Sunnyvale—and asserts that all its relevant documents are located in California. 6:11-CV-657, Docket No. 27, at 1, 7. In particular, NetApp contends its source code is maintained in California, as are its documents relating to the "design, development, testing, marketing and sales of the accused products." *Id.* at 7. Further, NetApp argues it has no relevant documents located in Texas. *Id.* at 4. PersonalWeb counters that this factor does not favor transfer because all its relevant documents are located in Texas. 6:11-CV-657, Docket No. 40, at 14.

This factor favors transfer. NetApp is headquartered in the Northern District of California, and it developed the accused products there. All its documents relating to its product's design, development, marketing, and sales are located in Sunnyvale. While all of PersonalWeb's documents are located in Texas, this does not move the needle in its favor. This factor turns on which party will have the greater volume of documents, which is usually the accused infringer. *See In re Genentech*, 566 F.3d at 1345. Accordingly, this factor favors transfer.

#### 2. Cost of attendance for willing witnesses

This factor is neutral. NetApp is headquartered in Sunnyvale, and it asserts that "virtually all" its employee witnesses with knowledge of the accused products are located in Northern California. 6:11-CV-657, Docket No. 27, at 7. PersonalWeb is headquartered in Tyler, and all its employees are located in the Eastern District of Texas. 6:11-CV-657, Docket No. 40, at 18.

24

Neither venue would be convenient for both parties. Because one party's witnesses will be inconvenienced in either venue, this factor is neutral.

### 3. Local interest in having localized interests decided at home

NetApp argues this factor favors transfer. NetApp is a Northern California company, and the accused products were designed and developed in California. 6:11-CV-657, Docket No. 27, at 3. The product group responsible for managing the accused products is also based in California, and NetApp contends all sales and business decisions regarding the accused products are made by California employees. *Id.* at 4. Additionally, NetApp asserts it has no relevant Texas connections. *Id.*

PersonalWeb counters that the Eastern District of Texas has an equally strong interest in this litigation. PersonalWeb is headquartered in Tyler, and all its employees and documents are located here. 6:11-CV-657, Docket No. 40, at 11. This gives the Eastern District of Texas an interest in this litigation. PersonalWeb also asserts that NetApp has some Texas connections. *Id.* at 9. PersonalWeb notes that NetApp has several offices in Texas, all of which it believes could be relevant to this litigation.[21] *Id.*

This factor favors transfer. While NetApp maintains at least three offices in Texas, those offices are not specifically relevant to the accused products. Instead, NetApp's Texas offices are regional sales centers with no distinct functionality or purpose. *See In re TS Tech*, 551 F.3d at 1321 (disregarding generalized contacts that could apply to any other venue). In contrast, NetApp's Northern California presence is significant. NetApp is headquartered in Sunnyvale, and it developed and manages the accused products from its corporate headquarters. Further, all of NetApp's relevant employees work in the Bay Area. These connections are sufficient to

---

[21] NetApp characterizes its Texas offices as "nothing more than locations of regional sales centers used strictly for field sales and customer support." 6:11-CV-657, Docket No. 65, at 3.

overcome PersonalWeb's connections to the Eastern District of Texas. This factor favors transfer.

### iv.  Amazon and Dropbox[22]

#### 1.  Relative ease of access to sources of proof

Amazon and Dropbox argue this factor favors transfer. Amazon is headquartered in Seattle, where all its relevant documents and materials are located. 6:11-CV-658, Docket No. 21, at 6. Amazon contends it would be significantly more convenient to transport its documents to California than to Tyler. *Id*. Dropbox is headquartered in San Francisco, where all its relevant technical and financial documents regarding the accused products are stored. *Id*. at 5. Further, both Defendants contend they have no relevant documents in the Eastern District of Texas. *Id*. at 9.

PersonalWeb argues this factor does not favor transfer. 6:11-CV-658, Docket No. 36, at 8. PersonelWeb asserts that all its documents are located in Tyler, and it would be inconvenient to transport them to Northern California. *Id*. PersonalWeb also challenges Amazon's assertion of convenience in the Northern District of California. *Id*. at 4. Amazon is headquartered in Seattle, so it would have to transport its documents regardless of which venue this case is tried. *Id*. PersonalWeb also attempts to marginalize the relevance of Dropbox's San Francisco documents. PersonalWeb asserts that its only claim of infringement against Dropbox pertains to Dropbox's use of a particular Amazon service. *Id*. Thus, the majority of relevant documents are likely to be found in Seattle, not San Francisco. *See* 6:11-CV-658, Docket No. 48, at 1 ("If Defendants were truly concerned about convenience, they would have moved for a transfer to Washington.").

---

[22] "PersonalWeb's claims against Dropbox solely pertain to Dropbox's use of Amazon's S3 service." 6:11-CV-658, Docket No. 36, at 4.

26

This factor slightly favors transfer. All of PersonalWeb's documents are located in Tyler, and all of Dropbox's documents are located in San Francisco. Between these two parties, there would be no increase in convenience by transferring the case. Instead, a transfer would merely shift the obligation of transporting documents from Dropbox to PersonalWeb. Amazon tips the scale slightly in favor of transfer. However, all of Amazon's documents are located in Seattle, so Amazon will have to transport them regardless of whether the case is tried in Tyler or San Francisco. The Court is skeptical of the true "convenience increase" by *only* having to transport its documents to San Francisco. Nevertheless, this factor slightly favors transfer.

### 2. Cost of attendance for willing witnesses

The analysis for this factor is very similar to the analysis for the location of evidence: all of PersonalWeb's employee witnesses are located in Tyler (6:11-CV-658, Docket No. 36, at 11); all of Amazon's employee witnesses are located in Seattle (6:11-CV-658, Docket No. 21, at 6); and all of Dropbox's employee witnesses are located in San Francisco (*Id.* at 5). Neither venue is convenient for all employee witnesses. In either venue, PersonalWeb or Dropbox will litigate in their home venue, and Amazon's employees will have to travel. Because it will be more convenient for Amazon's witnesses to attend trial in Northern California, this factor slightly favors transfer. However, since Amazon's witnesses will have to travel regardless of where trial is held, any incremental benefit obtained from transferring the case is minimal.

### 3. Local interest in having localized interests decided at home

Amazon and Dropbox contend the Northern District of California has a significant interest in this case. Dropbox is a start-up based in San Francisco, and all its relevant employees and evidence are located there. 6:11-CV-658, Docket No. 21, at 5. Amazon hosts its accused S3 service with servers in San Francisco. 6:11-CV-658, Docket No. 43, at 3. Additionally, both

27

Defendants represent that they have no relevant facilities in the Eastern District of Texas. 6:11-CV-658, Docket No. 21, at 9. In particular, Dropbox has no relevant facilities anywhere but San Francisco. *Id.* at 5.

PersonalWeb argues the two places with the most significant connections to this case are Tyler and Seattle. PersonalWeb is headquartered in Tyler, and all its employees and facilities are located in East Texas. 6:11-CV-658, Docket No. 36, at 2. Further, PersonalWeb contends that Amazon's ties to San Francisco are marginal at best. *See id.* at 4. The only real connection Amazon presented to the Northern District of California was that it maintained servers there. Lastly, PersonalWeb notes that Amazon has two offices in the Dallas area, indicating Amazon maintains significant ties to Texas.[23] *Id.*

This factor weighs against transfer. While Dropbox is headquartered in San Francisco, Amazon has no meaningful connection to the Northern District of California. Instead, Amazon's strongest connection is to the Western District of Washington, where it is headquartered. PersonalWeb, however, has a significant connection to the Eastern District of Texas. Because of PersonalWeb's strong connection to the Eastern District of Texas and Amazon's lack of connection to the Northern District of California, this factor weighs against transfer.

### v. Caringo

#### 1. Relative ease of access to sources of proof

Caringo argues this factor favors transfer. Caringo contends it has relevant documents in Belgium, and it would be easier to transport its European documents to California than to Tyler. 6:11-CV-659, Docket No. 21, at 12. Caringo also asserts that its CEO, Mark Goros, lives in La Jolla, California, and contends Mr. Goros may possess relevant documents. *Id.* PersonalWeb

---

[23] Amazon argues these facilities are a distribution center and an Amazon subsidiary, neither of which are related to this case. 6:11-CV-658, Docket No. 43, at 3.

counters that Caringo is headquartered in Austin, and it keeps a large number of relevant financial and technical documents at its headquarters. 6:11-CV-659, Docket No. 35, at 4, 9. Further, PersonalWeb's documents are located in Tyler, and it would be inconvenient to transport its documents to Northern California. *Id.*

This factor weighs against transfer. Caringo's only real support that it would be more convenient to transport evidence to the Northern District of California is that its CEO lives in San Diego. This is a stretch. While Mr. Goros may keep some relevant documents at his home, there are likely significantly more relevant documents located at Caringo's headquarters in Austin. Further, Caringo argues it would be more convenient to transport its European documents to California. Any increase in convenience achieved from *increasing* the distance the documents must be transported would be negligible. For all these reasons, and because both parties are headquartered in Texas, this factor weighs against transfer.

## 2. Cost of attendance for willing witnesses

Caringo identified three specific employee witnesses: Mark Goros, its CEO, who lives in La Jolla; Paul Carpenter, its CTO, who lives in Belgium; and Jan Van Riel, its Vice President of Advanced Technology, who lives in Belgium. 6:11-CV-659, Docket No. 21, at 6. Caringo argues a trial in the Northern District of California would be more convenient for all three men. Caringo contends Northern California would be more convenient for Goros because it is closer to his home, and it provided declarations from Carpenter and Van Riel stating it would be "far more convenient" for them to attend trial in California. *See id.* at 14.

PersonalWeb argues this factor weighs against transfer. PersonalWeb's employee witnesses are located in Tyler, and only one of Caringo's witnesses actually lives in California. 6:11-CV-659, Docket No. 35, at 12. The remaining two identified witnesses live in Europe, but

there are likely to be relevant employee witnesses at Caringo's headquarters in Austin as well. *See* 6:11-CV-659, Docket No. 48, at 4.

This factor weighs against transfer. Caringo only identified one employee witness in California, and he lives almost five hundred miles from San Francisco. Its other two identified witnesses reside in Belgium. Those witnesses will have to travel a significant distance regardless of where this case is tried. *See In re Genentech*, 566 F.3d at 1344 ("The witnesses from Europe will be required to travel a significant distance no matter where they testify."). In fact, they will have to travel a greater distance if this case is transferred to the Northern District of California. In contrast, there are a significant number of employee witnesses located in Texas. All of PersonalWeb's employees reside in Tyler, and Caringo is likely to have relevant witnesses at its Austin headquarters. For all these reasons, this factor weighs against transfer.

### 3. Local interest in having localized interests decided at home

This factor weighs against transfer. Both companies are headquartered in Texas, and both companies have only limited connections to California. Caringo's only California connection is that its CEO lives in La Jolla. *See* 6:11-CV-659, Docket No. 21, at 6. PersonalWeb's only California connection is that BDE is headquartered in Los Angeles. *See id.* at 3–4. These limited California contacts are not sufficient to overcome the fact that both companies are headquartered in Texas. Further, neither party's California connection is located in the Northern District of California. PersonalWeb's parent company is based in Los Angeles, and Caringo's CEO lives in San Diego. These cities reside in the Central and Southern Districts of California, respectively. This factor weighs against transfer.

### vi.  EMC and VMware[24]

#### 1.  Relative ease of access to sources of proof

The EMC Defendants[25] argue this factor favors transfer. VMware is headquartered in Palo Alto, and it asserts that most of its relevant documents are located in the Northern District of California. 6:11-CV-660, Docket No. 13, at 2. EMC is headquartered in Massachusetts, but it contends the majority of its relevant operations regarding the accused products are based in California. *Id.* at 7. Thus, most of EMC's relevant documents and evidence will be found in California. *Id.* Since most of the EMC Defendants' physical evidence is located in California, they argue this factor favors transfer. *Id.*

PersonalWeb contends this factor does not favor transfer. In particular, PersonalWeb asserts that its case against the EMC Defendants will largely focus on EMC's Centra product, which EMC purchased from a Belgian company called FilePool, N.V. 6:11-CV-660, Docket No. 20, at 10. Accordingly, PersonalWeb believes a large number of relevant documents will be located in Belgium, not Northern California.[26] *Id.* Further, PersonalWeb's relevant physical evidence is located in Tyler. *Id.* at 8.

This factor favors transfer. Both sides argue their relevant documents are located in their desired forums. The EMC Defendants contend most of their relevant documents are located in Northern California, while PersonalWeb contends all its relevant documents are located in Tyler. Each side has a significant volume of documents in its requested venue. Because the EMC Defendants are likely to have a larger volume of relevant documents, this factor favors transfer. *See In re Genentech*, 566 F.3d at 1345.

---

[24] VMware is a subsidiary of EMC. 6:11-CV-660, Docket No. 13, at 6 n.10.
[25] This order refers to EMC and VMware collectively as the "EMC Defendants." References to "EMC" refer to EMC alone.
[26] The EMC Defendants argue Centra is only one of ten accused EMC products. 6:11-CV-660, Docket No. 27, at 5.

## 2. Cost of attendance for willing witnesses

The analysis for this factor is very similar to the analysis for the location of evidence. The EMC Defendants contend the majority of their relevant employee witnesses are located in the Northern District of California. 6:11-CV-660, Docket No. 13, at 2. While both EMC and VMware maintain regional offices throughout the country, those offices are unlikely to have relevant employee witnesses. *Id.* at 7. PersonalWeb contends all its employee witnesses are located in the Eastern District of Texas, so trial in the Northern District of California would force its employees to travel a significant distance to testify. 6:11-CV-660, Docket No. 20, at 8. There is no perfect venue in this case—both venues would be convenient for one side but inconvenient for the other. Accordingly, this factor is neutral.

## 3. Local interest in having localized interests decided at home

The EMC Defendants contend this factor favors transfer. VMware is headquartered in Palo Alto, and "almost all of its potentially relevant operations" occur there. 6:11-CV-660, Docket No. 13, at 6. EMC's corporate headquarters are located in Massachusetts, but it argues most of its operations relating to the accused products are located in California. *Id.* at 7. EMC asserts that the majority of its relevant operations are located in either the Northern or Central Districts of California. *Id.* at 3.

PersonalWeb argues this factor weighs against transfer because of its ties to the Eastern District of Texas, and because the EMC Defendants maintain offices in Texas. 6:11-CV-660, Docket No. 20, at 4. Both EMC Defendants have offices in Texas, which EMC characterizes as field sales offices with no relevant documents or witnesses. *See* 6:11-CV-660, Docket No. 27, at 5. Additionally, PersonalWeb asserts that EMC's California contacts should be discounted because the company is headquartered in Massachusetts.

32

This factor favors transfer to the Northern District of California. VMware is based in Palo Alto, and EMC's product group relating to the accused product is stationed in Northern California. Collectively, the EMC Defendants employ over 6500 people in California. *See* 6:11-CV-660, Docket No. 13, at 7. These are significant contacts to the transferee venue. While PersonalWeb maintains strong ties to the Eastern District of Texas, these ties are not sufficient to overcome the EMC Defendants' ties to the Northern District of California. This factor favors transfer.

### vii.   HP, HPES, and Autonomy[27]

#### 1.   Relative ease of access to sources of proof

The HP Defendants[28] contend this factor favors transfer. HP is headquartered in Palo Alto, and it argues a majority of its relevant documents are located in Northern California. 6:11-CV-683, Docket No. 75, at 11. HP represents that the two scientists who developed the accused technology live in Palo Alto. *Id.* at 12. Thus, many documents relating to the creation of the accused products are located in Palo Alto. *Id.* Autonomy argues many relevant documents are located in San Francisco, where it maintains its American headquarters. 6:11-CV-683, Docket No. 63, at 3.

PersonalWeb argues this factor weighs against transfer for two reasons. First, PersonalWeb's physical evidence is located in Tyler. 6:11-CV-683, Docket No. 81, at 9. Second, the HP Defendants oversold the magnitude of their California evidence. HPES is headquartered in Plano, Texas,[29] and the HP Defendants never argued HPES's documents were not maintained there. *See* 6:11-CV-683, Docket No. 86, at 2. Further, Autonomy is "co-headquartered" in San

---

[27] HPES and Autonomy are wholly-owned subsidiaries of HP. 6:11-CV-683, Docket No. 63, at 1; Docket No. 75, at 11.

[28] This order refers to HP, HPES, and Autonomy collectively as the "HP Defendants."

[29] Plano is situated within the Eastern District of Texas.

Francisco and the United Kingdom. 6:11-CV-683, Docket No. 81, at 1. Autonomy was formed by researchers at Cambridge University, and it maintains dual headquarters today. *Id.* Accordingly, there are likely to be relevant documents in both San Francisco and England.

The factor weighs against transfer. PersonalWeb's documents are located in Tyler, and HPES's documents are located in Plano. While there are relevant documents in the Northern District of California, there is also a significant volume of relevant documents in the Eastern District of Texas. To the extent there are relevant documents in England, it would not be more convenient to transport those documents to Northern California than to Tyler. This factor weighs against transfer.

## 2. Cost of attendance for willing witnesses

The HP Defendants argue this factor favors transfer. The two scientists who developed the accused products live in Palo Alto, so it would be most convenient for them to testify in Northern California. 6:11-CV-683, Docket No. 75, at 12. HP also asserts the Director of Engineering of its StoreOnce Engineering Team resides in California. *Id.* Autonomy contends it has numerous potential witnesses in the Northern District of California, including witnesses with both financial and technical knowledge of the accused products. 6:11-CV-683, Docket No. 63, at 3, 9.

This factor is neutral. While both HP and Autonomy have relevant witnesses in the Northern District of California, PersonalWeb has relevant witnesses in the Eastern District of Texas. It would be no less convenient for PersonalWeb's witnesses to testify in California than it would be for HP or Autonomy's witnesses to testify in Tyler. Transfer would actually be less convenient for HPES's witnesses, who are likely to work at its corporate headquarters in Plano. Finally, to the extent Autonomy has relevant witnesses in the United Kingdom, there is little

34

difference in convenience between testifying in Tyler or California. Neither venue would be particularly convenient for all parties. Accordingly, this factor is neutral.

### 3. Local interest in having localized interests decided at home

The HP Defendants argue this factor favors transfer. HP is headquartered in Palo Alto, and much of the research leading to the accused products took place in Northern California. 6:11-CV-683, Docket No. 75, at 11. Autonomy employs around 500 people in California, including over 100 at its headquarters in San Francisco. 6:11-CV-683, Docket No. 63, at 13. While HPES is headquartered in Plano, the HP Defendants argue HPES's Plano contacts should not carry significant weight. HPES is a subsidiary of HP, and the HP Defendants contend HPES does not sell the accused products. 6:11-CV-683, Docket No. 91, at 2.

PersonalWeb argues this factor favors transfer. PersonalWeb contends the Eastern District of Texas has a significant interest in this case because PersonalWeb is headquartered in Tyler, and HPES is headquartered in Plano. PersonalWeb also argues the Northern District of California has less of a tie to this litigation than the HP Defendants indicate. HPES is headquartered in Plano, and Autonomy is "co-headquartered" in the United Kingdom. *See* 6:11-CV-683, Docket No. 81, at 1. Further, HP appears to concede that some product development took place in Bristol, England. *See* 6:11-CV-683, Docket No. 91, at 5 ("That some other work may have been done [outside of California] does not negate the fact that significant witnesses and evidence relevant to this case are all located in Northern California.").

This factor weighs against transfer. PersonalWeb's presence in Tyler gives the Eastern District of Texas a significant local interest in this case. While the HP Defendants contend Northern California has the greatest interest in this action, there are multiple other interested venues. HP and Autonomy are headquartered in Northern California, but HPES and

35

PersonalWeb are headquartered in the Eastern District of Texas. Autonomy is also co-headquartered in the United Kingdom, where the company was founded, and where some product development took place. For all these reasons, this factor weighs against transfer.

### viii. Facebook

#### 1. Relative ease of access to sources of proof

Facebook contends this factor favors transfer. Facebook is headquartered in the Northern District of California—Menlo Park—where it houses the vast majority of its relevant physical evidence. 6:12-CV-662, Docket No. 25, at 4. This includes nearly all of Facebook's proprietary information and source code, which is managed from Menlo Park. *Id.* at 7. Additionally, Facebook's financial and marketing documents are kept there. *Id.*

PersonalWeb makes two arguments that this factor weighs against transfer. First, PersonalWeb's documents and physical evidence are located in Tyler. 6:12-CV-662, Docket No. 32, at 2. Second, Facebook's largest office outside of Menlo Park is in Austin. *Id.* at 8. PersonalWeb believes Facebook will have a significant number of relevant marketing documents at its Austin office. *Id.*

Even though Facebook has an Austin office, PersonalWeb has not demonstrated the Austin office maintains documents specifically relevant to this litigation. Instead, both parties maintain a substantial majority of their relevant documents at their respective headquarters. As the accused infringer, Facebook is likely to possess a larger volume of documents relevant to this litigation. *See In re Genentech*, 566 F.3d at 1345. Accordingly, this factor favors transfer.

#### 2. Cost of attendance for willing witnesses

This factor is neutral. Both PersonalWeb and Facebook assert all their relevant employee witnesses work at their corporate headquarters. *See* 6:12-CV-662, Docket No. 25, at 4; Docket

No. 32, at 2. Regardless of where this case is tried, one party's witnesses will testify in their home venue, and the other party's witnesses will travel. Transferring this case would not impact the aggregate convenience of employee witnesses; it would merely shift the inconvenience from Facebook to PersonalWeb. Thus, this factor is neutral.

### 3. Local interest in having localized interests decided at home

Facebook argues this factor strongly favors transfer. Facebook has been headquartered in Northern California since its inception, and all relevant development of its accused products took place in Menlo Park. 6:12-CV-662, Docket No. 25, at 4. Almost all of Facebook's relevant employees work in Menlo Park, and none of its relevant employees work in the Eastern District of Texas. *Id.* at 11. Facebook further argues it has no particularized presence in the Eastern District of Texas. Facebook's website is accessible throughout the country, so this District has no specialized interest in the case. *Id.* at 14.

PersonalWeb argues this factor does not favor transfer because of PersonalWeb's significant ties to the Eastern District of Texas. Additionally, PersonalWeb contends Facebook has relevant connections throughout the country. 6:12-CV-662, Docket No. 32, at 5. In particular, Facebook maintains data centers in Oregon and North Carolina, as well as one in Sweden. *Id.* Facebook also maintains its second largest corporate office in Austin. *Id.* PersonalWeb argues "Texas is clearly not that inconvenient a venue for Facebook if the company can operate and manage its second largest U.S. office in that state." *Id.* at 8.

This factor favors transfer. Facebook is headquartered in Northern California, and all of its relevant operations occur there. It developed the accused products in Menlo Park with employees from Menlo Park, and it manages the accused product from Menlo Park. In contrast, Facebook has no real connection to the Eastern District of Texas. While Facebook maintains an

37

office in Austin, there is no indication the Austin office is relevant to this case. Even though PersonalWeb has ties to the Eastern District of Texas, this factor favors transfer.

### d. Application of the Transfer Factors

#### i. NECAM

One factor favors transfer, four factors weigh against transfer, and three factors are neutral.

NECAM is headquartered in Irving, Texas. *See* 6:11-CV-655, Docket No. 61, Ex. 1. With its transfer motion, NECAM attempts to transfer a dispute between two companies headquartered in Texas to Northern California. Granting this motion would ignore the significant ties both parties have to Texas. PersonalWeb is headquartered in Tyler, where all its documents and employees are located. NECAM is headquartered in Irving, just over 100 miles from the Tyler courthouse. Though NECAM has a significant presence in Northern California, it also has a significant presence in Texas and New Jersey, and a smaller presence in Washington. NECAM did not demonstrate it would be "clearly more convenient" to transfer this action to the Northern District of California. NECAM's Motion to Transfer (6:11-CV-655, Docket No. 59) is **DENIED**.

#### ii. Google and YouTube

Three factors favor transfer, one factor weighs against transfer, and four factors are neutral.

Unlike other Defendants, the Google Defendants did not overplay their ties to the Northern District of California. Both companies are headquartered there, both developed the accused products there, and both maintain all their relevant records there. Further, all their relevant employee witnesses work in Northern California. While PersonalWeb has significant ties to the Eastern District of Texas, the Google Defendants have literally no connection to this

38

District. It would be very inconvenient for the Google Defendants to litigate in a forum where they have no connections when the alternative is their home forum. On the other hand, PersonalWeb has ties to California—its parent company is headquartered in Los Angeles.

Accordingly, the Google Defendants have met their burden of proving the Northern District of California would be "clearly more convenient." The Motion to Transfer (6:11-CV-656, Docket No. 23) is **CONDITIONALLY GRANTED**.

### iii. NetApp

Three factors favor transfer, one factor weighs against transfer, and four factors are neutral.

This case has significant ties to the Northern District of California. NetApp is headquartered in Sunnyvale, and it developed the accused product there. Because the accused product is managed in California, all the relevant documents and employee witnesses are also located there. This case also has ties to the Eastern District of Texas. PersonalWeb is headquartered in Tyler, and all its documents and employee witnesses are located here. Additionally, NetApp maintains at least three offices in Texas. However, NetApp's Texas offices appear to be only marginally relevant to this case.

In total, it would be "clearly more convenient" to litigate this case in Northern California. Because of NetApp's significant contacts to the venue, transfer is appropriate. NetApp's Motion to Transfer (6:11-CV-657, Docket No. 27) is **CONDITIONALLY GRANTED**.

### iv. Amazon and Dropbox

One factor favors transfer, two factors slightly favor transfer, two factors weigh against transfer, and three factors are neutral.

39

PersonalWeb's home venue is the Eastern District of Texas; Amazon's home venue is not the Northern District of California. Amazon spends considerable briefing addressing its lack of ties to the Eastern District of Texas, but its ties to the Northern District of California are minimal at best, since Amazon is a Seattle company, and all its ties are to Seattle.[30] Amazon's only real tie to Northern California is that it hosts some servers in the Bay Area. This does not make it "clearly more convenient" for Amazon and PersonalWeb to litigate in the Northern District of California.[31] As a defendant seeking to transfer an action to a venue that is not its home, Amazon faces a greater challenge than a defendant seeking to transfer an action to its home forum.[32] *See In re Vistaprint Ltd.*, 628 F.3d at 1346–47; *In re HTC Corp.*, 2012 WL 4198258, at *2 (Fed. Cir. Sep. 20, 2012); *In re Amazon.com Inc.*, 2012 WL 1514442, at *2 (Fed. Cir. May 1, 2012); *In re Apple Inc.*, 2010 WL 1922942, at *1 (Fed. Cir. May 12, 2010); *cf. In re Link_A_Media Devices Corp.*, 662 F.3d 1221, 1223 (Fed. Cir. 2011) ("When a plaintiff brings its charges in a venue that is not its home forum, however, that choice of forum is entitled to less deference."). Amazon did not meet this burden. Because of PersonalWeb's significant ties to Tyler and Amazon's lack of ties to the Northern District of California, Amazon has failed to meet its burden.

With regard to Dropbox, judicial economy favors keeping it as well. Dropbox is accused of infringing by using Amazon's services, so there is likely to be significant factual and

---

[30] Amazon's de-emphasis of its Seattle headquarters is obvious from its briefing. Amazon's transfer motion does not even use the word "Seattle" until the sixth page, and then only twice thereafter. 6:11-CV-658, Docket No. 21, at 6. In the next sentence, it concedes Seattle is over 800 miles from the Northern District of California. *Id.* Amazon's reply brief never even mentions transfer to "Seattle" or "Washington." 6:11-CV-658, Docket No. 43. Further, Amazon repeatedly emphasizes its contacts on the "west coast," a careful attempt to avoid admitting it is not located in California. *See* 6:11-CV-658, Docket No. 21, at 6.

[31] Even if the location of servers made a venue convenient, this would still not favor transfer because PersonalWeb's servers are located in Tyler.

[32] Amazon has filed motions to transfer to a variety of other jurisdictions in the past three years. *See, e.g., Beneficial Innovations, Inc. v. Advance Publications, Inc. et al.*, 2:11-CV-229, Docket No. 162 (Southern District of New York – Denied); *Retail Limited v. Amazon.com, Inc.*, et al., 2:10-CV-258, Docket No. 86 (Central District of California – Denied); *Global Sessions LP v. Travelocity.com LP, et al.*, 6:10-CV-671, Docket No. 153 (Western District of Texas – Denied); *Eolas Techs. Inc. v. Adobe Sys. Inc., et al.*, 6:09-CV-446, Docket No. 424 (Northern District of California – Denied).

evidentiary overlap between the two Defendants. Thus, judicial economy is best promoted by keeping Amazon and Dropbox together. It would be highly inefficient to sever Amazon and Dropbox into different cases in different venues when the cases against both Defendants are very similar. *See In re Vistaprint*, 628 F.3d at 1345; *In re Volkswagen III*, 566 F.3d at 1351. Further, since Dropbox is accused of using Amazon products, Dropbox will have fewer relevant documents and witnesses than either Amazon or PersonalWeb. Therefore, while Dropbox has ties to San Francisco, these ties are not sufficient to overcome PersonalWeb's ties to Tyler and Amazon's lack of ties to the Northern District of California. The Motion to Transfer (6:11-CV-658, Docket No. 21) is **DENIED**.

### v.  Caringo

One factor favors transfer, four factors weigh against transfer, and three factors are neutral.

The arguments a party does not make can often be more telling than the arguments it does make. Such is the case here. In twenty pages of briefing, Austin-based Caringo used the word "Austin" exactly three times. *See* 6:11-CV-659, Docket No. 21, at 1, 9. Caringo never argued it had no relevant documents in Austin, never argued it had no relevant witnesses in Austin, and never argued it did not develop the accused product in Austin. Caringo's silence on all these issues leads to the inference that a large majority of Caringo's relevant activities occurred in Austin.

Caringo focused its briefing on the location of three employees—one in San Diego and two in Belgium. Caringo then asked the Court to ignore the location of its corporate headquarters and transfer the case to the Northern District of California because one employee lives in San Diego and two others live in Belgium. This is an exceptionally weak argument, especially

41

considering that PersonalWeb is also headquartered in Texas. It would not be "clearly more convenient" to try litigate case in the Northern District of California. Caringo's Motion to Transfer (6:11-CV-659, Docket No. 21) is **DENIED**.

### vi.  EMC and VMware

Three factors favor transfer, one factor weighs against transfer, and four factors are neutral.

Almost all the EMC Defendants' relevant ties are to the Northern District of California. VMware is headquartered in Palo Alto, and nearly all its relevant operations occur in Northern California. EMC is headquartered in Massachusetts, but it maintains a significant presence in California. Many of its relevant product groups are based in California, as is the majority of its physical evidence and witnesses. Further, neither EMC Defendant maintains a relevant presence in the Eastern District of Texas. Both companies have offices in Texas, but those offices are merely sales offices similar to many other offices throughout the country. These sales offices are unlikely to be relevant to this lawsuit. *See In re TS Tech*, 551 F.3d at 1321 (disregarding generalized contacts that could apply to any venue).

These ties make it "clearly more convenient" to litigate this case in Northern California, despite PersonalWeb's ties to Tyler. The Motion to Transfer (6:11-CV-660, Docket No. 13) is **CONDITIONALLY GRANTED**.

### vii.  HP, HPES, and Autonomy

One factor favors transfer, three factors weigh against transfer, and four factors are neutral.

As much as they try, the HP Defendants cannot avoid the fact that HPES is headquartered in the Eastern District of Texas, and Autonomy has a significant presence in the United

42

Kingdom. HPES, a wholly-owned subsidiary of HP, employs over 5000 people at its headquarters in the Eastern District of Texas. This fact alone, coupled with PersonalWeb's Tyler location, makes transfer inappropriate. However, transfer is also inappropriate because the Northern District of California has an inadequate connection to this case. Of the three HP Defendants, only HP is truly headquartered in Northern California. Even though Autonomy maintains its American headquarters in San Francisco, its founding headquarters are in the United Kingdom.

The HP Defendants have not demonstrated it would be "clearly more convenient" to litigate this dispute in the Northern District of California. The Motions to Transfer (6:11-CV-683, Docket Nos. 63 & 75) are **DENIED**.

### viii. Facebook

Three factors favor transfer, one factor weighs against transfer, and four factors are neutral.

Facebook has no connection to the Eastern District of Texas. In fact, Facebook's only connection to Texas is that it maintains an office in Austin. However, the Austin office does not appear to be relevant to this case. All of Facebook's relevant documents and witnesses are located in the Northern District of California, and Facebook developed the accused technology there. Thus, Facebook has a significant connection to the Northern District of California and no connection to the Eastern District of Texas. Although PersonalWeb has ties to Tyler, this is not sufficient to overcome Facebook's complete lack of ties to the venue. Facebook's Motion to Transfer (6:12-CV-662, Docket No. 25) is **CONDITIONALLY GRANTED**.

## CONCLUSION

### a.  Summary of the Transfer Analysis

The Court will transfer Google, YouTube, NetApp, EMC, VMware, and Facebook (collectively the "Transferring Defendants"). These Defendants have no relevant ties to the Eastern District of Texas *and* have significant ties to the Northern District of California. Google, YouTube, NetApp, Dropbox, VMware, and Facebook are all headquartered in the Northern District of California, and all contend they developed their accused products in the Bay Area. EMC is headquartered in Massachusetts, but the employees responsible for the accused products are stationed in Northern California.

The Court retains Amazon, Dropbox, NECAM, Caringo, HP, HPES, and Autonomy. Many of these Defendants have a significant presence in Texas. Three are headquartered in Texas: NECAM is headquartered in Irving; Caringo is headquartered in Austin; and HPES is headquartered in Plano. Two others have related corporate entities headquartered in Texas. HP, while based in Palo Alto, is the corporate parent of HPES. It would not promote judicial economy to sever HP and HPES into separate actions in separate venues. The same is true for Autonomy. Autonomy is a subsidiary of HP, and judicial economy will be best served by keeping all three HP Defendants together. There is likely to be significant evidentiary and factual overlap between all HP Defendants, so it would be best for a single court to preside over all three. Further, Autonomy maintains less of a Northern California presence than many other Defendants. Autonomy was founded in the United Kingdom, and it is still "co-headquartered" there today.

The Court retains Amazon because of its paucity of contacts to the Northern District of California. Amazon is headquartered in Seattle, and all its relevant contacts are located in

44

Washington State. This Court declines to transfer a case between a Texas Plaintiff and a Washington Defendant to California when there has been little showing of any relevant Amazon contacts in Northern California. The Court retains Dropbox because of its relationship with Amazon. Dropbox is accused of infringing by using Amazon servers, so judicial economy would be well served by keeping Amazon and Dropbox together.

### b. Conditional Transfer of Cases

All granted motions to transfer to the Northern District of California will become effective the day this Court issues its claim construction opinion.[33] Retaining the Transferring Defendants through the claim construction phase serves two important purposes. First, it conserves judicial resources by requiring only one district court to address the disputed claim terms, and second, it eliminates the risk of inconsistent claim constructions. *See In re Vistaprint Ltd.*, 628 F.3d at 1346; *In re Google Inc.*, 2011 WL 772875, at *2 (Fed. Cir. Mar. 4, 2011) ("Courts have consistently held that judicial economy plays a paramount role in trying to maintain an orderly, effective, administration of justice and having one trial court decide all of these claims clearly furthers that objective.") (citing *Cont'l Grain Co. v. Barge FB–585*, 364 U.S. 19, 26 (1960)).

Because several Defendants remain in the Eastern District of Texas, this Court will conduct a *Markman* hearing in July[34] regardless of when the Transferring Defendants are ultimately transferred to California. However, if the Transferring Defendants were immediately transferred, a California court would also have to go through that same process. This would essentially become an exercise in duplicating work. *See Van Dusen v. Barrack*, 376 U.S. 614, 634 (1964) (noting Congress was primarily concerned with convenience when it passed §

---

[33] The Claim Construction hearing is set for July 18, 2013. 6:11-CV-655, Docket No. 60.
[34] This includes three Defendants that have not moved to transfer. *See* 6:12-CV-658; 6:12-CV-660; 6:12-CV-663.

1404(a)). By transferring the Transferring Defendants immediately, the Court would be generating unnecessary work for the Northern District of California while failing to reduce its own workload. *See In re Volkswagen III*, 566 F.3d at 1351 ("To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent.") (quoting *Cont'l Grain Co.*, 364 U.S. at 26); *In re Vistaprint Ltd.*, 628 F.3d at 1344.

In addition to the Defendants involved in these transfer motions, there are five other PersonalWeb lawsuits before this Court asserting the True Name Patents. Three of those cases will participate in the July 2013 *Markman*, and none of those three defendants have moved to transfer. The two remaining defendants have not been assigned case management schedules, so it is unlikely they will participate in this summer's claim construction hearing. This means this Court will in all likelihood conduct a second *Markman* hearing involving the remaining defendants at some point in the future.

The claim construction process is one of the most difficult and time-consuming aspects of a patent case. Preparing for a *Markman* hearing and drafting the opinion require considerable judicial time and energy. It is illogical to obligate a second court to expend these same judicial resources to perform a duplicative task, especially considering this Court will likely have to go through the *Markman* process twice. Thus, retaining the Transferring Defendants through the *Markman* phase conserves limited judicial resources.[35]

---

[35] This Court frequently *transfers* cases to prevent duplicative claim construction opinions. *See, e.g., Fujitsu Ltd. v. Tellabs, Inc.*, 639 F. Supp. 2d 761, 768 (E.D. Tex. 2009) (Davis, J.); *Ho Keung Tse v. Google, Inc.*, 2012 WL 6497124, at *3 (E.D. Tex. Dec. 13, 2012) (Davis, J.); *On Semiconductor Corp. v. Hynix Semiconductor, Inc.*, 2010 WL 3855520, at *7 (E.D. Tex. Sep. 30, 2010) (Davis, J.); *Third Dimension Semiconductor, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 2008 WL 4179234, at *2 (E.D. Tex. Sep. 4, 2008) (Davis, J.); *Interactive Music Tech., LLC v. Roland Corp. U.S.*, 2008 WL 245142, at *11 (E.D. Tex. Jan. 29, 2008) (Davis, J.).

Retaining the Transferring Defendants through the *Markman* phase serves a second important purpose—it limits the risk of inconsistent claim constructions. *See Cont'l Grain Co.*, 364 U.S. at 26 (stating courts should avoid "a race in diligence among litigants for a trial in the District Court each prefers"); *cf. Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996) (emphasizing "the importance of uniformity in the treatment of a given patent"). The risk of inconsistent decisions is eliminated when a single district court construes the patents for all related cases. *See ColorQuick, L.L.C. v. Vistaprint Ltd.*, 2010 WL 5136050, at *8 (E.D. Tex. Jul. 22, 2010) (Davis, J.), *mandamus denied*, 628 F.3d 1342 (Fed. Cir. 2010). Though the transferee court will not be bound the by this Court's *Markman* opinion, it is hoped the opinion will be helpful to the transferee court.

Serially filed patent cases present a unique opportunity for cooperation among district courts. After *In re EMC Corporation*[36] and enactment of the America Invents Act,[37] it is more likely a court will transfer some defendants but keep others. *See Norman IP*, 2012 WL 3307942, at *4; *Oasis Research, LLC v. Carbonite, Inc.*, 2012 WL 3544881, at *6 (E.D. Tex. Aug. 15, 2012). When this occurs, the transferor and transferee courts can confer to determine whether the transferring court retains jurisdiction through the *Markman* phase or immediately transfers the case.

The Supreme Court stated that § 1404(a) should be regarded as a "federal judicial housekeeping measure." *See Van Dusen*, 376 U.S. at 636. In that regard, which district court actually goes through the *Markman* process can be resolved by cooperation among the district courts. *Cf. In re Vistaprint*, 628 F.3d at 1344 (rejecting any form of bright-line rule in the § 1404(a) analysis). The district courts have no desire to perform duplicate work or to author rival

---

[36] 677 F.3d 1351 (Fed. Cir. 2012).
[37] Pub. L. No. 112–29, 125 Stat. 284 (2011).

*Markman* opinions. District judges do not view the *Markman* process as a competition, but have the same overall interest—to author the highest quality opinions in the most efficient manner possible. Thus, which venue conducts the *Markman* proceedings can be resolved as a necessary part of case management by dialogue between the district judges.

Prior to issuing this opinion, the undersigned Chief Judge of the Eastern District of Texas conferred with the Chief Judge of the Northern District of California regarding the most efficient manner in which to manage the transfer of these serially filed patent cases in light of this court's pending July 18, 2013 *Markman* hearing. It was concluded that the best allocation of judicial resources was for the Eastern District to construe the claims for all related actions prior to transferring the cases to the Northern District of California.

Another concern with these impending transfers is the potential for significant delay to the parties in getting back on schedule for a trial date in the transferee district. Motions to transfer can often disrupt and stall litigation, increasing costs and adding years to the time of final resolution of the dispute. To minimize the potential problem of undue delay, once the Eastern District of Texas enters its conditional transfer order, a copy will be promptly forwarded to the Northern District of California. The Northern District will open case files and assign judges to all transferred cases. It is hoped that the judges will be able to accommodate the cases' current trial dates, insofar as consistent with their own schedules.

Upon receipt of this Court's claim construction order and final order of transfer, the Transferring Defendants shall immediately inform the transferee judges and request a case scheduling conference for all future proceedings through trial. Until then, all orders entered in the Eastern District remain in effect and any motions will be filed in the Eastern District. Because the parties will already know their new case numbers and judges, any delay resulting

from the transfers will be minimized, and the parties should be able to proceed to trial on a schedule as closely related to their original schedule as possible.

### c. Motions to Stay

Several Defendants filed motions to stay pending resolution of their transfer motions. *See* 6:11-CV-655 (Docket No. 72); 6:11-CV-656 (Docket No. 115); 6:11-CV-657 (Docket No. 91); 6:11-CV-658 (Docket No. 106); 6:11-CV-660 (Docket No. 95); 6:11-CV-683 (Docket No. 123); 6:12-CV-662 (Docket No. 26). Because the Court has resolved the underlying motions to transfer, the motions to stay are **DENIED-AS-MOOT**.

### d. Summary of Orders

For the foregoing reasons, the Court resolves the transfer motions as follows: 6:11-CV-655 (Docket No. 59) is **DENIED**; 6:11-CV-656 (Docket No. 23) is **CONDITIONALLY GRANTED**; 6:11-CV-657 (Docket No. 27) is **CONDITIONALLY GRANTED**; 6:11-CV-658 (Docket No. 21) is **DENIED**; 6:11-CV-659 (Docket No. 21) is **DENIED**; 6:11-CV-660 (Docket No. 13) is **CONDITIONALLY GRANTED**; 6:11-CV-683 (Docket No. 63) is **DENIED**; 6:11-CV-683 (Docket No. 75) is **DENIED**; 6:12-CV-662 (Docket No. 25) is **CONDITIONALLY GRANTED**.

The motions to stay (6:11-CV-655 (Docket No. 72); 6:11-CV-656 (Docket No. 115); 6:11-CV-657 (Docket No. 91); 6:11-CV-658 (Docket No. 106); 6:11-CV-660 (Docket No. 95); 6:11-CV-683 (Docket No. 123); 6:12-CV-662 (Docket No. 26)) are **DENIED-AS-MOOT**.

Defendants Google, YouTube, NetApp, EMC, VMware, and Facebook **WILL BE TRANSFERRED** to the Northern District of California immediately upon entry of this Court's *Markman* opinion. Until that time, all parties shall continue to operate under their existing docket control orders. All motions or other matters shall be filed in this Court until the transfer becomes

effective. Upon receipt of this order in the Northern District of California, the conditionally

transferred cases will be immediately assigned to a judge or judges, who will be informed of the

case management schedule and progress of these cases. The judge or judges will be requested to

accommodate that schedule as nearly as possible, consistent with his or her own schedule.

Immediately upon receipt of this Court's claim construction order, the Transferring Defendants

shall notify their assigned judge in the Northern District of California, and shall request a case

management conference be set as soon as possible.

So ORDERED and SIGNED this 21st day of March, 2013.

**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**